UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


CHARLES EDWARD BENORE,

       Petitioner,

   v.

MARY BERGHUIS,

       Respondent.

_____/

CASE NO. 2:07-CV-12692
JUDGE GEORGE CARAM STEEH
MAGISTRATE JUDGE PAUL J. KOMIVES

**REPORT AND RECOMMENDATION**

*Table of Contents*

I.      RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
II.     REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
        A.    *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
        B.    *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
        C.    *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
        D.    *Ineffective Assistance of Counsel (Claim I)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
              1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
              2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
        E.    *Photographic Evidence (Claim II)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
              1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
              2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
        F.    *Right to Present a Defense (Claim III)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
              1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
              2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
        G.    *Prosecutorial Misconduct (Claim IV)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
              1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
              2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
        H.    *Sufficiency of the Evidence (Claim V)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
              1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
              2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
        I.    *Jury Instruction (Claim VI)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
              1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
              2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
        J.    *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
III.    NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

I.      <u>RECOMMENDATION</u>: The Court should deny petitioner's application for the writ of habeas corpus.

II.     <u>REPORT</u>:

A.      *Procedural History*

        1.      Petitioner Charles Edwad Benore is a state prisoner, currently confined at the Brooks Correctional Facility in Muskegon Heights, Michigan.

        2.      On April 28, 2004, petitioner was convicted of first degree murder, MICH. COMP. LAWS § 750.316, following a jury trial in the Monroe County Circuit Court.  On June 10, 2004, he was sentenced to a mandatory term of life imprisonment without possibility of parole.

        3.      Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

> I.      CHARLES BENORE WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHERE HIS TRIAL ATTORNEY FAILED TO IMPEACH THE EYEWITNESS TO SOME OF THE EVENTS WITH HER CONTRADICTORY STATEMENT GIVEN TO POLICE ON THE DAY OF HER MOTHER'S DEATH.
>
> II.     MR. BENORE WAS DENIED A FAIR TRIAL WHEN THE JUDGE ADMITTED INTO EVIDENCE A MORBID PHOTOGRAPH OF MS. BROWN AND HER SLASHED THROAT WHICH WAS NOT PROBATIVE OF ANY ISSUE IN CONTENTION AND ONLY SERVED TO INFLAME THE JURY.  FURTHER, IT SHOULD NOT HAVE BEEN GIVEN TO THE JURY DURING DELIBERATIONS.
>
> III.    MR. BENORE WAS DENIED HIS CONSTITUTIONAL RIGHT TO PRESENT A DEFENSE WHEN THE TRIAL JUDGE CUT OFF INQUIRY INTO DEBORAH BROWN'S LONG TERM FIXATION THAT CAMERAS WERE PLANTED.
>
> IV.     BECAUSE THE LAW IS CLEAR THAT AN ACCUSER DOES NOT OBTAIN THE STATUS OF "VICTIM" UNTIL THE JURY MAKES THAT DETERMINATION, MR. BENORE SUFFERED A MISCARRIAGE OF JUSTICE WHERE THE PROSECUTOR REFERRED TO THE COMPLAINANT AS "VICTIM" 24 TIMES DURING THE PROCEEDINGS,

> AND HIS WITNESSES REFERRED TO HER AS "VICTIM" AN
> ADDITIONAL 39 TIMES, WHEN THE PRESUMPTION OF INNOCENCE
> SHOULD HAVE OBTAINED.

Petitioner, through new counsel, also filed a supplemental brief raising two additional claims:

> I.     THE TRIAL COURT UNLAWFULLY DEPRIVED THE DEFENDANT OF
> DUE PROCESS OF LAW AND REVERSIBLY ERRED IN DENYING THE
> DEFENSE MOTION FOR A DIRECTED VERDICT; IN THE
> ALTERNATIVE, THE EVIDENCE IS INSUFFICIENT TO SUPPORT 1ST-
> DEGREE OR 2D-DEGREE MURDER CONVICTIONS.

> II.    THE TRIAL COURT DENIED THE DEFENDANT HIS DUE PROCESS
> RIGHTS UNDER THE FEDERAL AND STATE CONSTITUTIONS AND
> REVERSIBLY ERRED IN FAILING TO INSTRUCT THE JURY
> PROPERLY ON MANSLAUGHTER.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence. *See People v. Benore*, No. 256299, 2005 WL 2861970 (Mich. Ct. App. Nov. 1, 2005) (per curiam).

4.     Petitioner, proceeding *pro se*, sought leave to appeal these issues to the Michigan Supreme Court.  The Supreme Court denied petitioner's application for leave to appeal in a standard order.  *See People v. Benore*, 475 Mich. 884, 715 N.W.2d 871 (2006).

5.     Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on June 26, 2007.  As grounds for the writ of habeas corpus, he raises the seven claims that he raised in the state courts.

6.     Respondent filed her answer on February 15, 2008.  She contends that petitioner's third, fourth, and sixth claims are procedurally defaulted, and that all of petitioner's claims are without merit.

B.     *Factual Background Underlying Petitioner's Conviction*

Petitioner was convicted of murder in connection with the death of Deborah Brown, his girlfriend, on May 11, 2003.  The evidence adduced at trial was accurately summarized in petitioner's

3

supplemental brief in the Michigan Court of Appeals:

On Mother's Day, May 11, 2003, 13-year-old Michelle Brown, whose mother is Deborah Marie Brown, was at 318 Ann Marie Drive in Milan, Michigan, with her mother and the defendant, who had been living with Deborah for about six years. The defendant had been her mother's boyfriend. Michelle split time living with her father and mother after they were divorced.

After watching a movie the night before, the defendant told Michelle that the fastest way to kill a human being was to cut their throat. The next day, Michelle woke up at around 8:30-9 a.m. and walked by her mother's bedroom door. Outside the door, Michelle wished her "Happy Mother's Day." Her mother thanked her.

The defendant was home that morning. Michelle walked over to the computer and made her mother a Mother's Day card. The defendant walked into the kitchen at around 9:15 a.m. Michelle saw the defendant walk over toward a TV set and knives that were kept in the kitchen near the stove as she sat at the computer in the office area of the house.

The defendant walked directly to where the knives were kept. Michelle was not paying much attention to him as she worked on her Mother's Day card. He asked her what she was doing and walked back to the bedroom. At around 9:30 a.m., Michelle heard weird crash noises like the sound of breaking glass or like something falling or hitting something.

She heard the noises two different times about 20 minutes apart. Around 10 a.m., Michelle next saw the defendant when he came out of the bedroom and in a jumpy way told her to get ready to go out for Mother's Day dinner in Toledo. Michelle told him she was still working on her card. He then went back into the bedroom.

Ten minutes later, the defendant came out of the bedroom and told Michelle to write a will for him. They sat down at the kitchen table and spent the rest of the day writing the will. Several times, Michelle asked where her mother was, and the defendant would not let Michelle see her. He said she was sleeping or something like that. He told her, too, she only could drink water and would not let her eat.

Michelle hand wrote a will for the defendant. She wrote what he told her to write. Later, the defendant got ready to leave, putting some things in his truck and grabbing his keys and some other things. He told her to let her mother sleep and not to go into her room for about 20 minutes after he left.

About 6:30 p.m., Michelle called her father to tell him she was going to be late. The defendant left the house around 7 p.m. He offered to give her a ride to her father's house, but Michelle refused because she wanted to see her mother. When the defendant left at around 7:05 p.m., Michelle looked out the window to make sure he was gone.

Then, she walked over to her mother's bedroom door. It was locked. She took apart a pen and used it to open the door. She opened the door and walked inside the bedroom. There were lumps on the bed, and it appeared to her something was under the covers.

Michelle looked around for her mother and did not find her. She walked

4

outside onto the deck from the bedroom and put the cover back on the hot tub. She saw a reddish substance on the floor on the other side of the bed as she walked back into the house.

Then, Michelle pulled the covers off the bed and saw her mother lying on it with her throat sliced and blood all around her. She saw something black like a coffee mug on the bed. Shocked, Michelle quickly covered her mother's body and ran out of the room. She called her father, talked to his live-in girlfriend, asked them to pick her up, and waited for them in the garage to make the 8-mile trip from their home to Deborah's house.

Michelle's father, Michael Brown, and his girlfriend, Sharon Nordquist, pulled into the driveway about 15 minutes later. Michelle got into his car and said she was never coming back to that house. Nordquist asked her if she had gotten into a fight with Deborah. Michelle said "no." She said the defendant had killed her and said her throat had been cut.

Her father said they were going to the police and drove to the Milan Police Department. Michelle talked to the police and gave them a key and garage door opener to the house. She identified in court the knife taken from the kitchen knife holder and the defendant.

Around dusk, the police went to Deborah's house where they looked around and at first other than an unmade bed did not see anything out of the ordinary. [A]n officer, James M. Butler, with his gun drawn walked into Deborah's bedroom a second time, he felt around under the comforter on the bed and touched something hard. He pulled back the covers and saw a foot.

Butler saw blood on the floor and a knife on the bed. He put the comforter down and walked toward the headboard. The State Police crime lab technicians later took the knife into evidence and later gave it to the Milan police. He touched the body. It was cool to the touch.

Butler looked at Deborah's throat. It had a large side-to-side cut in it. He looked for a pulse on her left arm. There was no pulse. The police officer walked out of the bedroom, called his commander, and asked for a fire rescue squad so it could declare Deborah dead.

Two emergency medical technicians arrived around 8 p.m. A State Police forensic scientist, Guy Nutter, found a knife laying on the bed next to Deborah's body, said there was significant blood and blood spatter on the bed, and could not tell from his blood splatter analysis what was in the mind of the killer. The body did not have any defensive wounds on it. A team of State Police forensic specialists could not find any fingerprints on the knife discovered on the bed.

Butler later went back to the police department where he helped his chief prepare search warrants. The State Police were called, took notes for the medical examiner of the crime scene, and arranged to have Deborah's body taken to the Wayne County Medical Examiner's Office.

Following an autopsy, the deputy chief medical examiner, Dr. Cheryl Loewe, concluded that Deborah bled to death as a result of a very large incised wound across the front of her neck. Dr. Loewe said Deborah's major blood vessels on her neck were cut and the depth of the wound on her left side was down to the depth of her spine,

nearly causing decapitation. The doctor, who believed Deborah died at least four hours before police found her body at around 7:40 p.m., saw two small puncture wounds on the upper chest that were made after Deborah died, but did not find any defensive wounds.

Police in Flat Rock were notified of the murder and were informed to look out for a vehicle the suspect may be driving to the home of a friend, Dennis Lear, who lived in that city. The police talked to Lear around noon after staking out his house. Around 11 a.m., Lear received a phone call from the defendant, who told him his life was over and "she had ruined Mother's Day."

Upset and shaken, Lear received another cell phone call from the defendant just as he told police what was going on. Lear said his calle[r] ID showed it was the defendant calling and when he answered the phone, he nodded to the police it was the defendant. Earlier, he had received several calls from the defendant. Lear told the defendant to turn himself in to the police.

Lear drove one of the police officers to the Flat Rock police station. On the way, Lear was still on the phone with the defendant and, with encouragement from the police, instructed the defendant to go to the Flat Rock station. They directed the defendant, who was lost on his way there, as to how to get to the Flat Rock police station.

When the defendant finally drove into the police station, the police ordered the defendant, who was cooperative, to get out of his car, drop his cell phone, and lie down on the ground. They handcuffed and led him into the station, where he was booked and told not to make any statements. He sat in the booking room until the Milan police arrived.

After being advised of and after waiving his right not to testify, the defendant took the stand and said that he worked for General Motors Powertrain in Toledo, Ohio, for 15 years as a machine technician running computer pneumatic machines. He has a high school diploma and over the years he has done welding work, drove semi-trucks, framed houses, and done "pretty much everything." He started working when he was 11 or 12 years old as a caddie at the Monroe Country Club. He is an avid golfer.

He met Deborah Brown in 1996 when they both worked at the Powertrain plant in Ypsilanti and when they were both married. They became romantically involved in November 1996 while they were still married to other people and in the spring of 1997 they moved in together. They separated in April 2000, but moved in together at the 318 Ann Marie Drive house in July 2002.

Deborah's daughter, Michelle, lived part-time with Deborah and the defendant. Deborah was seeing someone else when the defendant moved back in with her. The defendant had been transferred to the Toledo plant before he moved back in with Deborah. He told her he would be willing to move out if Deborah started going out with her foreman and appreciated her willingness to let him move in. He was strapped financially at the time.

In January or February 2003, the defendant wanted to move out but could not due to his financial problems. Deborah began accusing the defendant and co-workers of putting cameras in the house. She had two private eyes look with surveillance

6

equipment for cameras in her house. She had the defendant go to inspect her attic with one of the investigators so the PI would not leave any cameras there. No cameras were ever found. On different occasions, Deborah called the police to complain about alleged cameras in her house.

On May 11, 2003, Deborah was fairly agitated when she again accused the defendant of planting cameras in the house. The defendant, who did not put any cameras in the house, the day before got into an argument with Deborah when she accused him on the way to a mall in Ann Arbor of wanting to get her away from the house so cameras could be put in while they were gone. They slept in the same bed that night.

When they got up, Deborah again accused the defendant of putting cameras in the house and she said she was going to get to the bottom of it one way or another. Then, they fell back asleep and got up about 1-1/2 hours later when Deborah became very, very agitated again and said she'd call the police and have the defendant arrested. He took very seriously her threat to call the police.

Deborah got up and took her cell phone into the bathroom. The defendant asked her what she was doing, and she said she was calling the police to have him arrested. He believed that was what she was doing and was very upset. He went into the bathroom and took the phone away from her.

Deborah was yelling and screaming about the alleged cameras, said it was the defendant's fault, accused him of trying to wreck her life, and claimed he was trying to get her in trouble. Then, she went into the bedroom and picked up the cordless phone to call the police again. The defendant walked around from behind her and took the phone away. She became very agitated, saying she was going to call the police no matter what.

Deborah walked out of the bedroom toward the kitchen. She picked up the kitchen phone and started dialing it. The defendant walked up to her as she stood by the sink. He was very agitated and angry. He took the phone away from her and begged her to stop. She became very agitated and said the only way he was going to leave was in the back of a police car.

Deborah walked into the bedroom. Still agitated himself and believing he was going to jail, the defendant lost control, turned toward the knife block, grabbed a knife, and followed Deborah back to the bedroom. The defendant said he "blacked" and it "was like a tunnel" as he followed her to the bedroom. By the time he got to the bedroom, Deborah had picked up the other phone before he grabbed it from her.

He said he was so angry he could not see anything on either side of him. He had never before been as angry as he was when he walked into the bedroom. He does not have a clear memory of what happened. He remembered he threw the phone on the floor after he grabbed it from Deborah. As he took the phone away from her, Deborah turned around toward him. He turned her completely around, lunged on top of her on the bed as she fell back, and sliced her throat with the knife. Blood went everywhere.

He was so enraged he did not know what he was doing. He did not want to hurt Deborah. When he saw the blood coming out of her, he didn't know what to do. He put the knife down, grabbed her arm, found no response, and grabbed a pillow to

7

try to stop the bleeding.  When he put the pillow on her neck, the bleeding stopped.

He did not call 911 because the speed at which the blood came out of her body and the lack of response from her led him to believe his life was over.  He later moved her arms and put them across her stomach together "to make her more comfortable."  He shut her eyelids and picked up one of her feet to put it on the bed.  He looked at the clock; it was round 8:25 a.m.

The defendant looked out the front windows of the house and then went to the kitchen to look out the window there.  At around 9 a.m., after going into and out of the bedroom 3-4 times, he saw Michelle working on the computer.  He did not call the police because he was planning to kill himself.  He turned himself in to the Flat Rock police the next day.

During the night, the defendant drove around to find a place to kill himself.  He said it was seconds between the time he talked to Deborah in the kitchen and the killing in the bedroom.  He did not think about what he was doing.  His mental state did not change from the kitchen to the bedroom.  He did not think about what he was doing with the kitchen knife.

When he was in the kitchen, the defendant did not decide to kill Deborah.  It was not his intention to kill her when he got up that morning.  He loved Deborah.

Def.-Appellant's Supp. Br. on Appeal, in *People v. Benore*, No. 256299 (Mich. Ct. App.), at 8-16

(citations omitted).

C.      *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the

provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-

132, 110 Stat. 1214 (Apr. 24, 1996).  *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997).  Amongst

other amendments, the AEDPA amended the substantive standards for granting habeas relief by

providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v.*

*Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.     *Ineffective Assistance of Counsel (Claim I)*

Petitioner first contends that his counsel rendered ineffective assistance by failing to properly impeach the victim's daughter with her statement to the police. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.     *Clearly Established Law*

The Sixth Amendment right to counsel and the corollary right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id*. at 687. These two components are mixed questions of law and fact. *See id*. at 698. Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the

10

inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.  If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.*

With respect to the performance prong of the inquiry, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance.  *See id.* at 689; *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994).  "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted).  "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690.  With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

2.    *Analysis*

Petitioner contends that there were substantial difference between Michelle Brown's testimony at trial and the statement that she gave to the police on the day of the murder, and that had these differences been explored by defense counsel his voluntary manslaughter defense would have succeeded.  Specifically, petitioner contends that Michelle testified that her mother was alive and responded to her when she wished her mother a happy Mother's Day and that she heard a loud noise while she was using the computer, whereas she did not mention these facts in her statement to the police.  The Michigan Court of Appeals rejected these claims, reasoning that "counsel was able to elicit testimony from Brown that she heard the victim accuse defendant of hiding surveillance cameras in her house and that she also heard the victim call and talk to the police on the morning she was

11

killed," testimony that was consistent both with Michelle's "police statement as well as with defendant's testimony that he killed the victim out of blind rage because she accused him of hiding surveillance cameras in her house and attempted to call the police." *Benore*, 2005 WL 2861970, at *1, slip op. at 2. The court also reasoned that the fact that Michelle may not have included certain details in her statement to the police did not necessarily render her subsequent testimony about those details inconsistent, and in any event "during cross-examination, defense counsel addressed the details of Brown's statement to the police that defendant contends were inconsistent with her trial testimony, and Brown clarified and explained the statements." *Id*. at *2, slip op. at 2. The Court should conclude that this determination was reasonable.

Counsel was faced with a difficult task, having to cross-examine the minor daughter of the victim, whom petitioner did not dispute having killed. The trial transcript reveals that counsel nevertheless extensively cross-examined Michelle regarding her recollection of the morning of the murder, and attempted to impeach her with her prior statement to the police with respect to her testimony regarding an argument on the day before the murder and whether her mother responded to her after she woke up. *See* Trial Tr., Vol. I, at 302-04, 311. Counsel also elicited from Michelle that her testimony might not be completely accurate regarding the timing of events that morning, and that she had refreshed her recollection prior to testifying. *See id*. at 312-13. "[C]ourts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel." *Dell v. Straub,* 194 F. Supp. 2d 629, 651 (E.D. Mich. 2002) (Friedman, J.); *see Fugate v. Head*, 261 F.3d 1206, 1219 (11th Cir. 2001); *Dows v. Wood*, 211 F.3d 480, 489 (9th Cir. 2000). "Impeachment strategy is a matter of trial tactics, and tactical decisions are not ineffective assistance of counsel simply because in retrospect better tactics may have been available." *Dell*, 194 F. Supp. 2d at 1219; *accord Millender v. Adams*, 187 F. Supp. 2d 852, 872 (E.D. Mich. 2002) (Rosen, J.). The

mere fact that other avenues of impeachment may have existed does not render counsel ineffective; counsel need not "develop every bit of testimony through all available inconsistent statements." *Poyner v. Iowa*, 990 F.2d 435, 438 (8th Cir. 1993); *see also*, *Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir. 1995) (internal quotation omitted) (counsel not ineffective even though "other testimony might have been elicited from those who testified."); *United States v. Kozinski*, 16 F.3d 795, 817 (7th Cir. 1994) (counsel not ineffective where counsel could have elicited additional impeachment information on cross-examination).

Here, the record shows that counsel ably presented extensive evidence on petitioner's behalf, and thoroughly cross-examined the prosecution's witnesses. That some unidentified questions may have been inartfully phrased, or some particular avenues not fully explored, does not support a finding that counsel's performance was deficient. *See Millender*, 187 F. Supp. 2d at 872; *Johnson v. Hofbauer*, 159 F. Supp. 2d 582, 607 (E.D. Mich. 2001) (Tarnow, J.). Defense counsel thoroughly cross-examined each of the prosecution witnesses, eliciting weaknesses in their version of events and inconsistencies in their testimony. The record shows that counsel's cross-examination was more than adequate to meet the Sixth Amendment standard for effective assistance of counsel. *See, e.g.*, *Sherron v. Norris*, 69 F.3d 285, 290 (8th Cir. 1995); *United States v. McKinney*, 954 F.2d 471, 481 (7th Cir. 1992); *Garcia v. Kuhlmann*, 897 F. Supp. 728, 730 (S.D.N.Y. 1995); *Wolfe v. United States*, 894 F. Supp. 1310, 1317 (D. Minn. 1995), *aff'd*, 92 F.3d 1190 (8th Cir. 1996). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

E.    *Photographic Evidence (Claim II)*

Petitioner next contends that he was denied a fair trial by the admission of a photograph of the victim showing her injuries. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

13

1.      *Clearly Established Law*

It is well established that habeas corpus is not available to remedy a state court's error in the application of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Jackson v. Ylst*, 921 F.2d 882, 885 (9th Cir. 1990) (a federal court on habeas review "ha[s] no authority to review a state's application of its own laws). Thus, unless a violation of a state's evidentiary rule results in the denial of fundamental fairness, an issue concerning the admissibility of evidence does not rise to the level of a constitutional magnitude. *See Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Davis v. Jabe*, 824 F.2d 483, 487 (6th Cir. 1987). "[A] federal habeas court has nothing whatsoever to do with reviewing a state court ruling on the admissibility of evidence under state law. State evidentiary law simply has no effect on [a court's] review of the constitutionality of a trial, unless it is asserted that the state law itself violates the Constitution." *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993). As the Sixth Circuit has noted, "[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994). In short, "[o]nly when the evidentiary ruling impinges on a specific constitutional protection or is so prejudicial that it amounts to a denial of due process may a federal court grant a habeas corpus remedy." *Barrett v. Acevedo*, 169 F.3d 1155, 1163 (8th Cir. 1999); *see also*, *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001). Where a specific constitutional right–such as the right to confront witnesses or to present a defense–is not implicated, federal habeas relief is available only if the allegedly erroneously admitted evidence "is almost totally unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot v.*

*Estelle*, 463 U.S. 880, 899 (1983).

    2.    *Analysis*

Petitioner contends that he was denied a fair trial by the admission into evidence of a photograph of the victim's naked body lying in a pool of blood. The Michigan Court of Appeals rejected this claim, reasoning that the photograph was relevant to showing petitioner's intent and to support the medical examiner's testimony regarding cause of death. *See Benore*, 2005 WL 2861970, at *3, slip op. at 3. The court also noted that the photograph was a black and white photograph, which muted its graphic nature, and that the trial court allowed only this single photograph into evidence, and did not allow into evidence more gruesome color photographs. *See id*. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

As noted by the court of appeals, the nature of the victim's wounds and the positioning of her body after death were relevant to petitioner's intent, which was the sole issue at trial. "The admission of relevant photographs of a crime scene or victim, even if gruesome, does not deprive a criminal defendant of a fair trial." *Skrzycki v. Lafler*. 347 F. Supp. 2d 448, 455 (E.D. Mich. 2004) (Gadola, J.); *see also*, *Gerlaugh v. Stewart*, 129 F.3d 1027, 1032 (9th Cir. 1997) (admission of gruesome photographs generally does not "raise[] the specter of fundamental unfairness such as to violate federal due process law."); *Pearl v. Cason*, 219 F. Supp. 2d 820, 830 (E.D. Mich. 2002) (Edmunds, J.) ("[A] challenge to the admission of a gruesome photograph does not present a question of constitutional magnitude."); *cf. Biros v. Bagley*, 422 F.3d 379, 391 (6th Cir. 2005). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.    *Right to Present a Defense (Claim III)*

Petitioner next contends that he was denied his right to present a defense when the trial court prohibited him from testifying about the victim's accusations that he had placed surveillance cameras

in the home.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

      1.    *Clearly Established Law*

Although the Constitution does not explicitly provide a criminal defendant with the right to "present a defense," the Sixth Amendment provides a defendant with the right to process to obtain witnesses in his favor and to confront the witnesses against him, and the Fourteenth Amendment guarantees a defendant due process of law.  Implicit in these provisions is the right to present a meaningful defense.  As the Supreme Court has recognized, "[t]he right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense." *Washington v. Texas*, 388 U.S. 14, 19 (1967).  "The right to compel a witness' presence in the courtroom could not protect the integrity of the adversary process if it did not embrace the right to have the witness' testimony heard by the trier of fact.  The right to offer testimony is thus grounded in the Sixth Amendment." *Taylor v. Illinois*, 484 U.S. 400, 409 (1988).  Further, the Court has noted that "[t]his right is a fundamental element of due process of law," *Washington*, 388 U.S. at 19, and that "[f]ew rights are more fundamental[.]" *Taylor*, 484 U.S. at 408.  Although the right to present a defense is fundamental, it is not absolute.  Thus, the right must yield to other constitutional rights, *see e.g.*, *United States v. Trejo-Zambrano*, 582 F.2d 460, 464 (9th Cir. 1978) ("The Sixth Amendment right of an accused to compulsory process to secure attendance of a witness does not include the right to compel the witness to waive his Fifth Amendment privilege."), or to other legitimate demands of the criminal justice system, *see United States v. Scheffer*, 523 U.S. 303, 308 (1998).

To constitute a denial of the right to present a defense, a trial court's exclusion of evidence must "infringe[] upon a weighty interest of the accused." *United States v. Scheffer*, 523 U.S. 303, 308 (1998).  A "weighty interest of the accused" is infringed where "the exclusion of evidence seriously undermined 'fundamental elements of the defendant's defense' against the crime charged." *Miskel*

16

*v. Karnes*, 397 F.3d 446, 455 (6th Cir. 2005) (quoting *Scheffer*, 523 U.S. at 315). Thus, "'[w]hether the exclusion of [witnesses'] testimony violated [defendant's] right to present a defense depends upon whether the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist.'" *United States v. Blackwell*, 459 F.3d 739, 753 (6th Cir. 2006) (quoting *Washington v. Schriver*, 255 F.3d 45, 47 (2d Cir. 2001)) (alterations by quoting court). In other words, application of the rules of evidence constitute a denial of the right to present a defense only where it "significantly undermine[s] fundamental elements of the accused's defense," *Scheffer*, 523 U.S. at 315–that is, where the application of the evidentiary rules "infringe[s] upon a weighty interest of the accused." *Scheffer*, 523 U.S. at 308.

　　2.　　*Analysis*

　　At trial, petitioner at one point testified that when the victim woke up in the morning on the day of the murder that she "was still yelling and screaming about the cameras and that I'm at fault, I'm the one that's trying to wreck her life, I'm the one that's trying to do everything and get her in trouble, I'm the one's that's gonna . . . ." Trial Tr., Vol. II, at 178. The prosecutor objected on the ground that petitioner's testimony was hearsay, and the trial court sustained the objection. *See id*. at 178-79. Petitioner contends that this ruling deprived him of his right to present a defense, namely, that he acted with sufficient provocation–the victim's accusations regarding his installing surveillance cameras–to reduce the crime to manslaughter. The Michigan Court of Appeals rejected this claim, concluding that the evidence was not admissible under the state of mind exception to the hearsay rule, MICH. R. EVID. 803(3), because it was being offered to show the defendant's, rather than the declarant's, state of mind. *See Benore*, 2005 WL 2861970, at *4, slip op. at 4. The court also concluded that, even assuming that the prosecutor's objection should not have been sustained, petitioner could not show prejudice. The court reasoned that despite the trial court's ruling "defense

17

counsel effectively obtained the substantive information from defendant's testimony regarding the victim's accusatory comments about defendant placing the surveillance cameras in her home and threatening to call the police to arrest defendant on the day she was killed." *Id.* The Court should conclude that petitioner was not entitled to habeas relief on this claim.

As noted above, the trial court's evidentiary ruling violated petitioner's right to present a defense only if it "significantly undermine[d] fundamental elements of [his] defense." *Scheffer*, 523 U.S. at 315. Here, petitioner's defense was not undermined because he was able to fully present his defense, and all the evidence in support of that defense, to the jury. Notwithstanding the trial court's ruling with respect to this specific answer given by petitioner, petitioner testified extensively regarding the victim's accusations that he had placed surveillance cameras in the home and her threats to call the police. *See* Trial Tr., Vol. II, at 169-71, 173, 175-76, 177, 181, 184, 196-97. Counsel also elicited from Michelle Brown testimony regarding the surveillance camera accusation by the victim. *See id.*, Vol. I, at 310. Finally, counsel fully presented the voluntary manslaughter defense to the jury during closing argument, including a reference to the video surveillance accusations made by the victim. *See id.*, Vol. II, at 252. Thus, the jury was presented with extensive evidence that the victim had on numerous occasions accused petitioner of placing video surveillance cameras in the home and had threatened to call the police on him on the morning of the murder. The prosecutor's objection to one specific answer given by petitioner did not prevent him from presenting to the jury his theory of the case or any evidence in support of that theory, and thus the trial court's ruling on the prosecutor's objection did not infringe a weighty interest of petitioner. *Cf. Blanton v. Elo*, 186 F.3d 712, 715-16 (6th Cir. 1999) (no denial of right to present defense were excluded evidence was cumulative). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

18

G.    *Prosecutorial Misconduct (Claim IV)*

Petitioner next contends that he was denied a fair trial by misconduct of the prosecutor and prosecution witnesses in referring to the decedent as the "victim."  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.    *Clearly Established Law*

For habeas relief to be warranted on the basis of prosecutorial misconduct it is not enough that the prosecutor's conduct was "undesirable or even universally condemned."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  Rather, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Id.* (internal quotation omitted).  "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982).  In determining whether the prosecutor's conduct was so egregious as to warrant habeas relief, a court should consider "the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury; and the strength of the competent proof to establish the guilt of the accused."  *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (internal quotations and citations omitted).  In sum, to constitute a denial of due process the prosecutor's conduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial."  *Id.* (internal quotation omitted).

2.    *Analysis*

Petitioner contends that the prosecutor or the prosecution's witnesses referred to the deceased as the "victim" on 24 separate accusations.  Petitioner argues that because "the legal status of an accuser as victim does not obtain until a conviction is entered," *People v. Stanaway*, 446 Mich. 643, 677 n.37, 521 N.W.2d 557, 574 n.37 (1994), these references were improper.  The Michigan Court

of Appeals rejected this claim, concluding that "[t]he record indicates that defendant admitted killing the victim, and thus, referring to her as the 'victim' was accurate and was not prejudicial to defendant." *Benore*, 2005 WL 2861970, at *5, slip op. at 5. The Court should conclude that this determination was reasonable.

The references to the deceased as the "victim" were completely accurate, and thus petitioner cannot show that the references were improper. A victim is "[a] person harmed by a crime, tort, or other wrong." BLACK'S LAW DICTIONARY (8th ed. 2004). As the court of appeals observed, there was no question in this case that the deceased was a "victim" as that term is understood. She had obviously died at some one's hand, having had her throat slit, and petitioner admitted that he had killed the victim. The only question was his mental state in doing so. Because there was simply no dispute that the victim had died as a result of the petitioner's own criminal agency, the prosecutor's reference to her as the "victim" was neither improper nor prejudicial. "Certainly, regardless of how the decedent had come to [have her throat cut], [s]he could be described accurately as a victim of circumstance. Whether the prosecutor used the word 'victim' or 'decedent' seems to be of little moment. To say that the use of the one word as opposed to the other would conjure up prejudice against appellant in the minds of the jurors is indeed to stretch a point based upon semantics." *Agee v. State*, 544 N.E.2d 157, 159 (Ind. 1989). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.[1]

H.      *Sufficiency of the Evidence (Claim V)*

---

[1]Petitioner also contends that his trial counsel was ineffective for failing to object to these improper references to the deceased as the victim. Because the references were not improper, petitioner cannot show that counsel was ineffective for failing to object. Counsel cannot be deemed ineffective for failing to raise a meritless objection. *See Bradley v. Birkett*, 192 Fed. Appx. 468, 475 (6th Cir. 2006); *Anderson v. Goeke*, 44 F.3d 675, 680 (8th Cir. 1995); *Burnett v. Collins*, 982 F.2d 922, 929 (5th Cir. 1993).

Petitioner next contends that the evidence presented by the prosecutor was insufficient to establish his guilt of first degree premeditated murder beyond a reasonable doubt. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.    *Clearly Established Law*

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970). Under the pre-AEDPA standard for habeas review of sufficiency of the evidence challenges, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Reviewing courts must view the evidence, draw inferences and resolve conflicting inferences from the record in favor of the prosecution. *See Neal v. Morris*, 972 F.2d 675, 678 (6th Cir. 1992). In determining the sufficiency of the evidence, the court must give circumstantial evidence the same weight as direct evidence. *See United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993).

However, under the amended version § 2254(d)(1) a federal habeas court must apply a more deferential standard of review of the state court decision. Thus, the question here is whether the Michigan Court of Appeals's application of the *Jackson* standard was reasonable. *See Gomez v. Acevedo*, 106 F.3d 192, 198-200 (7th Cir. 1997), *vacated on other grounds sub nom. Gomez v. DeTella*, 522 U.S. 801 (1998); *Restrepo v. DiPaolo*, 1 F. Supp. 2d 103, 106 (D. Mass 1998).

While a challenge to the sufficiency of the evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, *see Jackson*, 443 U.S. at 324, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how

21

a State defines the offense that is charged in any given case." *Patterson v. New York*, 432 U.S. 197, 211 n.12 (1977); *see also*, *Jackson*, 443 U.S. at 324 n.16; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). Thus, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999). Accordingly, it is necessary to examine the elements of second degree murder under Michigan law.

Under Michigan law, the common law crime of murder is defined as second degree murder, and is punishable by up to life imprisonment. *See* MICH. COMP. LAWS § 750.317. To establish second degree murder, the prosecution must show that the defendant killed a human being with malice aforethought. In order to show malice aforethought, the prosecution must establish one of three mental states on the part of the defendant at the time of the killing: (1) intent to kill; (2) intent to commit great bodily harm; or (3) intent to create a very high risk of death or great bodily harm with the knowledge that death or great bodily harm is the probable result. *See People v. Dykhouse*, 418 Mich. 488, 495, 345 N.W.2d 150, 151 (1984); *People v. Aaron*, 409 Mich. 672, 713-14, 299 N.W.2d 304, 319-20 (1980). Certain additional elements elevate second degree murder to first degree murder, which is punishable by a mandatory term of nonparoleable life imprisonment. These include murder done with premeditation and deliberation or committed in the course of certain enumerated felonies. *See* MICH. COMP. LAWS § 750.316(1)(a), (b).

Under Michigan law, "[p]remeditation is measured in time; time to permit a reasonable person to subject the nature of his response to a second look." *People v. Brown*, 137 Mich. App. 396, 407, 358 N.W.2d 592, 597 (1984). "The elements of premeditation and deliberation may be inferred from the circumstances surrounding the killing." *People v. Anderson*, 209 Mich. App. 527, 537, 531 N.W.2d 780, 786 (1995). Relevant factors include the relationship of the parties, the defendant's actions prior to the killing, the circumstances of the killing, and the defendant's conduct

22

after the killing.  *See id*.; *Brown*, 137 Mich. App. at 407, 358 N.W.2d at 597.  Further, because first

degree murder requires premeditation and deliberation rather than simply malice aforethought (as

is required for second degree murder), the actor must have the specific intent to kill in order to be

convicted of first degree murder.  *See People v. Hart*, 437 Mich. 898, 898, 465 N.W.2d 328, 328

(1991); *People v. Dykhouse*, 418 Mich. 488, 495, 345 N.W.2d 150, 151 (1984); *People v. Aaron*, 409

Mich. 672, 715 n.102, 299 N.W.2d 304, 320 n.120 (1980).  As with premeditation, "[t]he specific

intent to kill may be proven by inference from any facts in evidence."  *Warren v. Smith*, 161 F.3d

358, 361 (6th Cir. 1998) (internal quotation omitted).  Specifically, and in addition to other factors,

the Court "may take into consideration 'the nature of the defendant's acts constituting the assault

. . . [and] whether the instrument and means used were naturally adapted to produce death[].'"  *Id*.

(quoting *People v. Taylor*, 422 Mich. 554, 375 N.W.2d 1, 8 (1985)).

    2.    *Analysis*

Petitioner contends that the prosecution presented insufficient evidence that he acted with

premeditation and deliberation.  The Court should disagree.  As explained by the Michigan Court of

Appeals, there was ample evidence from which the jury could have inferred that petitioner acted with

premeditation and deliberation in killing the victim.  Contradicting petitioner's testimony that he had

done so in the midst of his argument with the victim and without knowing what he was doing,

Michelle Brown testified that petitioner went over to the wooden block of knives and took a knife

before entering the victim's bedroom.  *See* Trial Tr., Vol. I, at 280-81.  This testimony alone, if

believed by the jury, supports a finding that petitioner had time to take a second look at his actions

and thus supports a finding that he acted with premeditation.  *Cf. Ware v. Harry*, 636 F. Supp. 2d 574,

596 (E.D. Mich. 2008) (Cleland, J., adopting report of Komives, M.J.).  Further, there was ample

evidence that petitioner failed to seek assistance for the victim after he realized what he had done,

23

another factor from which his premeditation can be inferred.  *See DeLisle v. Rivers*, 161 F.3d 370, 389 (6th Cir. 1998) (en banc).  "Further, there was evidence . . . that petitioner attempted to conceal the crime, which also provides circumstantial evidence of his intent."  *Ware*, 636 F. Supp. 2d at 596 (citing *People v. Gonzalez*, 468 Mich. 636, 641, 664 N.W.2d 159, 163 (2003)).  Thus, the Michigan Court of Appeals's rejection of petitioner's claim was reasonable.

Petitioner's argument that the evidence showed, at most, manslaughter is unavailing.  Under Michigan law "[m]anslaughter is murder without malice."  *People v. Mendoza*, 468 Mich. 527, 534, 664 N.W.2d 685, 689 (2003).  "Murder and manslaughter are both homicides and share the element of being intentional killings.  However, the element of provocation . . . characterizes the offense of manslaughter [and] separates it from murder."  *People v. Pouncey*, 437 Mich. 382, 388, 471 N.W.2d 346, 350 (1991).  Thus, "[u]nder Michigan law, 'voluntary manslaughter is an intentional killing committed under the influence of passion or hot blood produced by adequate provocation, and before a reasonable time has passed for the blood to cool and reason to resume its habitual control.'" *Todd v. Stegal*, 40 Fed. Appx. 25, 29 (6th Cir. 2002) (quoting *People v. Fortson*, 202 Mich. App. 13, 19, 507 N.W.2d 763, 767 (1993)).  In other words, "to show voluntary manslaughter, one must show that the defendant killed in the heat of passion, the passion was caused by adequate provocation, and there was not a lapse of time during which a reasonable person could control his passions."  *Mendoza*, 468 Mich. at 535-36, 664 N.W.2d at 690.

Not every form of provocation, however, will suffice to negate the malice necessary for murder.  As the Michigan Supreme Court has explained,

> [t]he provocation necessary to mitigate a homicide from murder to manslaughter is that which causes the defendant to act out of passion rather than reason. . . .
>      In addition, the provocation must be adequate, namely, that which would cause the reasonable person to lose control.  Not every hot-tempered individual who flies into a rage at the slightest insult can claim manslaughter.  The law cannot countenance

the loss of self-control; rather, it must encourage people to control their passions.

*Pouncey*, 437 Mich. at 389, 471 N.W.2d at 350; *see also*, *People v. Sullivan*, 231 Mich. App. 510, 518, 586 N.W.2d 578, 582 (1998).  As to the second factor, "the provocation must be adequate, namely, that which would cause the reasonable person to lose control.  Not every hot-tempered individual who flies into a rage at the slightest insult can claim manslaughter."  *Pouncey*, 437 Mich. at 389, 471 N.W.2d at 350; *see also*, *People v. Sullivan*, 231 Mich. App. 510, 518, 586 N.W.2d 578, 582 (1998).  Importantly, "[t]he determination of what is reasonable provocation is a question of fact for the fact finder."  *Pouncey*, 437 Mich. at 390, 471 N.W.2d at 350.

Here, there was ample evidence from which the jury could have rejected petitioner's voluntary manslaughter defense beyond a reasonable doubt.  First, as the court of appeals explained, the evidence that supported a finding of premeditation–petitioner's going to the kitchen for a knife–also provided evidence that petitioner "had a chance to reflect or control his passions."  *Benore*, 2005 WL 2861970, at *7, slip op. at 7.  Second, the jury could have simply concluded that the victim's threat to call the police was not sufficiently provocative that a reasonable person would have lost control.  Again, as explained by the court of appeals, "[t]here was no evidence of a struggle, an attack by the victim, or any other occurrence that would prompt any unthinking use of the knife in the bedroom." *See id*.  Thus, there was sufficient evidence from which the jury could have concluded, beyond a reasonable doubt, that petitioner acted with premeditation and not under the heat of adequate provocation.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

I.      *Jury Instruction (Claim VI)*

Finally, petitioner contends that he was denied a fair trial by the trial court's faulty instruction on voluntary manslaughter.  The Court should conclude that petitioner is not entitled to habeas relief

on this claim.

      1.    *Clearly Established Law*

It is well established that habeas corpus is not available to remedy a state court's error in the application of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Jackson v. Ylst*, 921 F.2d 882, 885 (9th Cir. 1990) (a federal court on habeas review "ha[s] no authority to review a state's application of its own laws"). Thus, in order for habeas corpus relief to be warranted on the basis of incorrect jury instructions, a petitioner must show more than that the instructions are undesirable, erroneous or universally condemned; rather, taken as a whole, they must be so infirm that they rendered the entire trial fundamentally unfair. *See Estelle*, 502 U.S. at 72 (1991); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Wood v. Marshall*, 790 F.2d 548, 551-52 (6th Cir. 1986); *cf. United States v. Sheffey*, 57 F.3d 1419, 1429-30 (6th Cir. 1995) (standard of review for jury instructions challenged on direct criminal appeal). As the Supreme Court noted in *Estelle*, the Court should "also bear in mind [the Supreme Court's] previous admonition that we 'have defined the category of infractions that violate "fundamental fairness" very narrowly.'" *Estelle*, 502 U.S. at 72-73 (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)).

Despite this deferential standard of review, a jury instruction will not withstand scrutiny if it submits alternative theories for the jury to convict, one of which is permissible and the other unconstitutional, and the reviewing court cannot determine on which theory the jury relied. *See Zant v. Stephens*, 462 U.S. 862, 881-83 (1983); *Bachellar v. Maryland*, 397 U.S. 564, 571 (1970); *United States v. Wilkinson*, 26 F.3d 623, 625 (6th Cir. 1994). *But see Griffin v. United States*, 502 U.S. 46, 56 (1991) (general jury verdict is valid if sufficient evidence supports one of the grounds for conviction, so long as the other submitted grounds are neither illegal nor unconstitutional, but merely

unsupported by the evidence); *United States v. Mari*, 47 F.3d 782, 785-86 (6th Cir. 1995). An instruction is also invalid if it can be viewed by the jury as shifting the burden of proving an element of the case onto the defendant, as when it instructs the jury to presume that a person intends to commit the natural, ordinary and usual consequences of his voluntary actions, *see Sandstrom v. Montana*, 442 U.S. 510, 524 (1979), or to presume malice from either an unlawful act or from the use of a deadly weapon, *see Yates v. Evatt*, 500 U.S. 391, 401-02 (1991); *Houston v. Dutton*, 50 F.3d 381, 385-86 (6th Cir.1995). If an instruction is ambiguous and not necessarily erroneous, it can run afoul of the Constitution only if there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution. *See Estelle*, 502 U.S. at 72 & 73 n.4; *Boyde v. California*, 494 U.S. 370, 380 (1990). Nonetheless, instructional errors of state law will rarely form the basis for federal habeas corpus relief. *See Estelle*, 502 U.S. at 71-72.

2.      *Analysis*

At petitioner's trial, the trial court gave the following instruction regarding voluntary manslaughter:

> [T]he crime of murder may be reduced to voluntary manslaughter, a lesser-included offense, if the Defendant acted out of passion or anger brought about by adequate cause, and before the Defendant had a reasonable time to calm down. For manslaughter, the following things must be proved in addition to venue: First, that when the Defendant acted, his thinking must be disturbed by emotional excitement, to the point that a reasonable person might have acted on impulse without thinking twice from passion instead of judgment. This emotional excitement must have been the result of something that would cause a reasonable person to act rashly or on impulse. The law does not say what things are enough to do this. That is for you to decide, jurors. Next, the killing must result from this emotional excitement. The Defendant must have acted before a reasonable time had passed to calm down and return to reason. The law does, again, not say how much time is needed. Members of the jury, the test is whether a reasonable time passed under the circumstances of this case.

Trial Tr., Vol. II, at 276. The Court should conclude that this instruction adequately conveyed to the

27

jury the elements of voluntary manslaughter.

As noted above, under Michigan law "to show voluntary manslaughter, one must show that the defendant killed in the heat of passion, the passion was caused by adequate provocation, and there was not a lapse of time during which a reasonable person could control his passions." *Mendoza*, 468 Mich. at 535-36, 664 N.W.2d at 690. Each of these elements was given to the jury. The trial court's instruction explicitly told the jury that a voluntary manslaughter verdict was appropriate if petitioner "acted out of passion or anger brought about by adequate cause, and before the Defendant had a reasonable time to calm down." Trial Tr., Vol. II, at 276. The trial court's instruction comported with the relevant Michigan Criminal Jury Instruction, *see* MICHIGAN CRIMINAL JURY INSTRUCTIONS 2D, § 16.9, and the instructions as a whole adequately conveyed the mental state requirements for first-degree murder, second-degree murder, and manslaughter. Further, the instruction did not deprive petitioner of a fair trial because it provided the jury no guidance on what constitutes adequate provocation. The instruction did explain that the provocation must have been sufficient to a cause a reasonable person to act rashly or on impulse, and it was for the jury to determine whether the provocation at issue met this standard. Because the instruction adequately conveyed to the jury the elements of voluntary manslaughter, petitioner cannot show that he was denied a fair trial by the instruction. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.[2]

J.     *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of

---

[2]As with his prosecutorial misconduct claim, petitioner contends that counsel was ineffective for failing to object to the trial court's voluntary manslaughter instruction. And as with the prosecutorial misconduct claim, the fact that the instruction was not objectionable precludes a finding that counsel was ineffective for failing to object.

petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law.  Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

III.     NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/Paul J. Komives_____
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

29

Dated: 10/28/09

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record   by electronic means or U.S. Mail on October 28, 2009.

s/Eddrey Butts
Case Manager